## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **ELIZABETH KAUFMAN**, individually and on behalf of all other similarly situated individuals,<br><br>      Plaintiffs,<br><br>v.<br><br>**GARDNER PIE COMPANY**,<br><br>      Defendant. | Case No.:<br><br>**COLLECTIVE AND CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff, ELIZABETH KAUFMAN ("Plaintiff"), individually and on behalf of all similarly situated employees ("Plaintiffs"), by and through her attorneys, hereby brings this Collective and Class Action Complaint against Defendant GARDNER PIE COMPANY ("Defendant"), and states as follows:

### INTRODUCTION

1.      This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiff, individually and on behalf of all similarly situated employees of Defendant, arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111 *et seq.*, the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15, and common law.

2.      Defendant manufactures frozen, unbaked pies for the in-store bakery market, producing bakery items for sale in commercial and retail sectors from its manufacturing plant in Akron, Ohio. Defendant distributes its baked goods for sale across the United States and internationally. (*See* **Exhibit A**, Gardner Pie Company Employee Handbook, p. 6).

3.      Plaintiffs are and were employed to work in Defendant's manufacturing plant

1

located in Akron, Ohio.

4.    Due to food safety and quality standards, Defendant required Plaintiffs to wear company-issued uniforms and protective clothing during their work shifts for their own safety and to comply with food safety and health regulations. (*Id*. at pp. 7, 12).

5.    The company-issued protective clothing and safety gear includes a short-sleeve button-up shirt with over ten buttons and/or snap-clasps, long-legged pants with a zipper and button clasp, foam earplugs, vinyl gloves, and a hairnet. Plaintiffs were also required to keep and maintain a pair of non-slip shoes in their company lockers to be worn with the rest of their company-issued protective clothing and safety gear inside the production facility (hereinafter, this personal protection equipment will be collectively referred to as "the PPE").

6.    Defendant required Plaintiffs to change into ("don") and change out of ("doff") the PPE before and after their work shifts in designated locations at Defendant's manufacturing facility. (*Id*. at p. 12).

7.    Defendant also required Plaintiffs to doff the PPE anytime they left the facility, for example, on their break or during their lunch period, in designated locations at Defendant's manufacturing facility. (*Id*. at p. 12). Plaintiffs were then required to don the PPE again upon returning to the facility before they could resume their shift.

8.    The process of donning and doffing the PPE was compensable because Defendant and government regulations required Plaintiffs to wear the PPE during their work shifts and to don and doff the PPE at the worksite.

9.    Additionally, the PPE was an integral and indispensable part of the Plaintiffs' principal work activities, as the Plaintiffs could not safely or lawfully perform their production activities without wearing the PPE.

10.     Plaintiffs spent substantial amounts of time each day donning and doffing the PPE and walking to and from the locker room and the production area before, during, and after their work shifts.

11.     Defendant, however, did not pay the Plaintiffs for this time. Instead, Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. Because Plaintiffs were required don their PPE *before* they were "clocked-in" and doff their PPE *after* they were "clocked-out," Plaintiffs were not paid for their time beginning with their first principal activity of the workday and continuing through their last principal activity of the workday. (*See Id*. at p. 12) ("Employees are required to change into their uniforms before clocking in for work").

12.     Consequently, Defendant failed to pay Plaintiffs for all compensable time, including overtime.

13.     In addition to Plaintiffs' off-the-clock work, Defendant failed to compensate Plaintiffs at the appropriate overtime rate using the FLSA's "regular rate" calculation. More specifically, Defendant failed to include non-discretionary bonuses or other remuneration paid to Plaintiffs in calculating their correct overtime premiums as required by the FLSA. 29 C.F.R. §§ 778.108-109. Instead, Defendant only paid Plaintiffs an overtime premium calculated from their base hourly rates.

14.     The individuals that the named Plaintiff seeks to represent in this action are current and former production employees who either currently work for Defendant at its manufacturing facility in Akron, Ohio or who previously worked at the facility during the applicable time period and who are/were required to don and doff protective clothing and safety gear before the start of, during, and after the end of their work shifts and, additionally, who were not compensated at their

appropriate overtime rate.

15.     Defendant knew or could have easily determined how long it took Plaintiffs to complete their donning, doffing, and walking activities, and Defendant could have properly compensated Plaintiffs for this pre-, mid-, and post-shift work, but deliberately chose not to.

16.     Plaintiffs who elect to participate in this FLSA collective action seek compensation for all off-the-clock work performed for Defendant, and compensation at the appropriate overtime rate for all hours worked in excess of 40 per week, an equal amount for liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

17.     Plaintiffs seek a declaration that their rights were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such unlawful conduct in the future.

## **JURISDICTION**

18.     This Court has subject matter jurisdiction over Plaintiff's FLSA claim under 28 U.S.C. § 1331 because Plaintiff's claim raises a federal question under 29 U.S.C. § 201 *et seq.*

19.     Additionally, this Court has jurisdiction over Plaintiff's FLSA claim under 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

20.     Defendant's annual sales exceed $500,000, and Defendant has more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendant's employees, including Plaintiff, engaged in interstate commerce or in the production of goods for commerce; therefore, they were also covered by the FLSA on an individual basis.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because the state law claims and the federal claim are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

22.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over Defendant because it is incorporated in the state of Ohio and maintains its principal place of business in the state of Ohio.

## VENUE

24.     Venue is proper in the Northern District of Ohio under 28 U.S.C. §§ 1391 (b)(1) and (2) because Defendant resides in this District and employs Plaintiff and other production employees in this District.

## INTRADISTRICT ASSIGNMENT

25.     A substantial part of the events or omissions giving rise to the claims alleged herein occurred at Defendant's Akron, Ohio manufacturing facility; therefore, this action is properly assigned to the Eastern Division.

## PARTIES

26.     Plaintiff, Elizabeth Kaufman, is an Ohio resident who worked for Defendant as an hourly production employee at Defendant's Akron, Ohio manufacturing facility from October 2021 until March 2022. Defendant most recently paid Plaintiff $15.00 per hour, plus incentive compensation in the form of non-discretionary bonuses. Throughout her employment with Defendant, Plaintiff often worked 40 or more hours per week and worked overtime during numerous workweeks, including the week ending November 21, 2021. *See e.g.*, **Exhibit B**, Plaintiff's November 24, 2021 Earnings Statement. Plaintiff signed a consent form to join this

collective action lawsuit, which is attached as **Exhibit C**.

27.     Additional putative Collective members were or are employed by Defendant as hourly employees during the past three years and their consent forms will also be filed in this case.

28.     Defendant, Gardner Pie Company, is an Ohio corporation (Entity Number: 218557) with its principal executive office located at 191 Logan Parkway, Akron, Ohio 44319. Its registered agent for service of process is Matthew Goff, 191 Logan Parkway, Akron, Ohio 44319.

## GENERAL ALLEGATIONS

**A.     Defendant's Operations and Manufacturing Facilities**

29.     Defendant manufactures frozen, unbaked pies for the in-store bakery market, producing bakery items for sale in commercial and retail sectors from its manufacturing plant in Akron, Ohio. Defendant distributes its baked goods for sale across the United States and internationally. (**Exhibit A**, Gardner Pie Company Employee Handbook, p. 6).

30.     Plaintiffs are and were employed in Defendant's manufacturing facility located at 191 Logan Parkway, Akron, Ohio 44319.

**B.     Defendant Required Plaintiffs to Utilize Company-Issued PPE in Order to Protect Themselves and to Comply with Food Safety and Health Regulations**

31.     For their own personal safety, and due to food safety regulations and quality standards inherent in Defendant's operations, Defendant required Plaintiffs to wear company-issued PPE during their work shifts. (*See* **Exhibit A**, Gardner Pie Company Employee Handbook, pp. 7, 12).

32.     The company-issued PPE included a short-sleeve button-up shirt with over ten buttons and/or snap-clasps, long-legged pants with a zipper and button clasp, foam earplugs, vinyl gloves, and a hairnet. Plaintiffs were also required to keep and maintain a pair of non-slip shoes in their company lockers to be worn with the rest of their company-issued protective clothing and

6

safety gear inside the production facility.

33.    Defendant required Plaintiffs to don and doff the PPE before and after their work shifts in designated locations at Defendant's manufacturing facility. (*Id.* at p. 12).

34.    Defendant prohibited Plaintiffs from donning or doffing the PPE at home. (*Id.*).

35.    Defendant prohibited Plaintiffs from taking the PPE home with them or otherwise removing the PPE from Defendant's manufacturing facilities. (*Id.*).

36.    Defendant furnished Plaintiffs with freshly laundered PPE each workday.

37.    Defendant prohibited Plaintiffs from leaving the locker room and walking to the production area without wearing the PPE.

38.    Defendant prohibited Plaintiffs from entering certain areas of the manufacturing facility, including the production area, without wearing the appropriate PPE.

39.    Defendant prohibited Plaintiffs from leaving the production area and walking back to the locker room without wearing the PPE.

40.    Defendant prohibited Plaintiffs from leaving the manufacturing facility without doffing the PPE and changing into different footwear.

41.    Plaintiffs spent substantial amounts of time each day donning and doffing the PPE and walking to and from the locker room and the production area before, during, and after their work shifts.

42.    Defendant, however, did not pay Plaintiffs for this time. (*See Id.*) ("Employees are required to change into their uniforms before clocking in for work").

43.    Instead, Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. Because Plaintiffs were required to don their PPE before they were "clocked-in" and doff their PPE after they were "clocked-out," Plaintiffs were not paid for

the time they spent performing their first and last principal activities of the workday.

44.     Consequently, Defendant did not pay Plaintiffs for all compensable time, including overtime.

C.     **Pre-Shift Donning and Walking Activities**

45.     Before their scheduled shifts and before they began their production activities, Plaintiffs were required to undertake the following principal work tasks in chronological order:

- Upon arriving at the facility, Plaintiffs were required to "badge-in" to the facility, swiping their security badge at the employee entrance before walking inside the building;

- Once inside the building, Plaintiffs walked through numerous rooms and hallways, including the lunchroom and an outside area, to get to an outdoor trailer that was fashioned into two rooms: a locker room and a dressing room;

- After entering the outdoor trailer and proceeding to the locker room, Plaintiffs retrieved their freshly-laundered short-sleeve button-up shirt with over ten buttons and/or snap-clasps and the long-legged pants with a zipper and button clasp from their personal locker;

- After retrieving their protective clothing from their locker room's personal locker, Plaintiffs carried their items to the secondary dressing room, which contained another personal locker. Plaintiffs then unlocked the combination lock, removed their shoes, stowed the items in their lockers, and then put on their short-sleeve button-up shirts and the long-legged pants, as well as their non-slip shoes that they were required to keep and maintain for use inside the facility;

- After readying and donning their protective clothing, Plaintiffs locked their personal lockers' combination lock and began to traverse back through the numerous rooms and hallways, including the outdoor area and the lunchroom, and proceeded towards the production area; and

- Once outside of the production area, Plaintiffs retrieved their company-issued foam earplugs and hairnets.  Plaintiffs then donned their foam earplugs and hairnets before finally "clocking-in" to Defendant's timekeeping system and entering the production facility.

46.     The pre-shift donning and walking process at the Akron, Ohio facility took substantial time on a daily basis, ranging from 13 to 15 minutes per shift.

47.     However, Plaintiffs were not paid for this time. Instead, Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. Because

8

Plaintiffs were required to don their PPE before they were "clocked-in", Plaintiffs were not paid for the time they spent performing their first principal activities of the workday.

48.     Consequently, Plaintiffs performed unpaid pre-shift work in the range of 13 to 15 minutes per shift.

**D.     Mid-Shift Walking, Doffing, and Donning Activities**

49.     Defendant also required Plaintiffs to doff the PPE anytime they left the facility, for example, on their breaks or during their lunch periods, in designated locations at Defendant's manufacturing facility. (*See* **Exhibit A**, Gardner Pie Company Employee Handbook, pg. 12) ("[I]f an employee leaves the building for any reason (going to parking lot, breaks, lunches, leaving for the day, etc.), they must clock out before changing out of their uniforms").

50.     Upon leaving Defendant's facility for their breaks, Plaintiffs were required to undertake the following principal work tasks in chronological order:

- Once Plaintiffs stepped out of the facility's production area, Plaintiffs were required to "clock-out" using Defendant's timekeeping system and then embark on a one to two minute walk through numerous rooms and hallways to get back to the outdoor trailer that contains the locker room and the dressing room;

- Plaintiffs then removed their company issued gloves, foam earplugs, and hairnets. Once inside the locker room, Plaintiffs slipped off their company-issued shirts and pants, untied and removed their non-slip shoes, and placed the PPE in their lockers to don again after their break;

- After removing their protective clothing and placing them in the lockers, the Plaintiffs then proceeded into the dressing room, unlocked the combination locks on their personal lockers, placed their non-slip shoes inside, changed into the shoes they wore to the facility, locked their combination locks on their personal lockers, and then proceeded to exit the outdoor trailer; and

- Finally, Plaintiffs traversed back through the numerous rooms and hallways to reach the employee entrance/exit of the facility.

51.     After returning to the facility after their break period, Plaintiffs were then required to don the PPE again (through the same process described above) before they could clock in and

resume their shift.

52.     Plaintiff received two, unpaid, 30-minute breaks per shift.  Plaintiff estimates it took between 3 to 5 minutes per mid-shift break to walk and doff her PPE before going on each break, and an additional 5 to 7 minutes per mid-shift break to walk and don her PPE once returning from each break.[1]

53.     As such, the mid-shift walking, doffing, and donning process took substantial time on a daily basis, ranging from approximately 16 to 24 minutes over the two breaks each shift.

54.     Plaintiffs were not paid for this time because Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. Because Plaintiffs were required to don their PPE before they were "clocked-in" and doff their PPE after they were "clocked-out," Plaintiffs were not paid for the time they spent performing these mid-shift work activities.

**E.     Post-Shift Walking and Doffing Activities**

55.     After completing their production activities, Plaintiffs were required to undertake the following principal work tasks in chronological order:

- Once Plaintiffs stepped out of the facility's production area, Plaintiffs were required to "clock-out" using Defendant's timekeeping system and then embark on a one to two minute walk through numerous rooms and hallways to get back to the outdoor trailer that contained the locker room and the dressing room;

- Plaintiffs then removed their company issued gloves, foam earplugs, and hairnets. Once inside the locker room, Plaintiffs unbuttoned their company-issued shirts and pants, untied and removed their non-slip shoes, and placed the soiled PPE in a large designated dirty laundry bin;

- After removing their protective clothing and placing them in the designated bin, Plaintiffs then proceeded into the dressing room, unlocked the combination locks on their personal lockers, placed their non-slip shoes inside, changed into the shoes they wore to the facility, locked their combination locks on their personal lockers, and then proceeded to exit the

---

[1] The mid-shift donning and doffing process took less time than the pre-shift donning and post-shift doffing time because there were fewer steps involved.

outdoor trailer; and

- Finally, Plaintiffs traversed back through the numerous rooms and hallways to reach the employee entrance/exit of the facility.

56.     The post-shift walking and doffing process took substantial time on a daily basis, ranging from approximately 8 to 10 minutes per shift.

57.     Plaintiffs were not paid for this time because Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. Because Plaintiffs were required to doff their PPE after they were "clocked-out," Plaintiffs were not paid for the time they spent performing their last principal activities of the workday.

**F.      Defendant's Timekeeping System Failed to Properly Account for Plaintiffs' Donning, Doffing, and Walking Activities**

58.     During their shifts, Plaintiffs were required to enter their time into Defendant's time-keeping system using a computer terminal just outside of the production area, but again, Defendant only paid Plaintiffs based on the time they were "clocked-in" to Defendant's timekeeping system. As Plaintiffs were required to don their PPE before they were "clocked-in" and doff their PPE after they were "clocked-out," Plaintiffs were not paid for the time they spent performing their first and last principal activities of the workday.

59.     As described above, it took Plaintiffs a significant amount of time on a daily basis to complete their donning, doffing, and walking activities, all of which were part of Plaintiffs' continuous workday under the FLSA.

60.     Consequently, Defendant's timekeeping system failed to account for all of the time Plaintiffs spent donning and doffing the PPE, and walking to and from the outdoor trailer and production area.

11

**G.**   **Donning and Doffing the PPE at the Worksite are Principal Work Activities and Compensable under the FLSA**

61.    Defendant required Plaintiffs to wear the PPE during their work shifts in order to comply with food safety and health regulations. Additionally, the PPE was an integral and indispensable part of Plaintiffs' principal work activities, as Plaintiffs could not safely or lawfully perform their production activities without wearing the PPE.

62.    Donning and doffing protective clothing and safety gear are principal activities under the Portal-to-Portal Act, 29 U.S.C. § 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the FLSA.

63.    The determination of whether donning and doffing PPE is compensable begins with *Steiner v. Mitchell*, 350 U.S. 247 (1956), the seminal case on the subject. In *Steiner*, the Supreme Court held that donning and doffing PPEs was compensable when employees handling dangerous chemicals in a wet storage battery factory were "compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law required their employer to provide." *Id*. at 248.

64.    The factory workers in *Steiner* were exposed to high levels of lead particles (dust and fumes), which "permeate[d] the entire plant and everything and everyone in it." *Id*. at 249. Lead dust attached to the skin, hair, clothing and shoes of the employees, and presented significant risks to family members of the workers because toxic particles could be "brought home in the workers' clothing or shoes." *Id*. at 250.

65.    Consequently, the workers were issued old but clean clothes on-site, and were required to don and doff the clothes at the factory and shower on the premises before leaving in

order to minimize health risks to themselves and others. *Id*. at 255. Under these circumstances, the

Court had "no difficulty" concluding that these dress-related activities were compensable under

the FLSA. *Id*.

66.     Following the Supreme Court's decision in *Steiner*, the Department of Labor

("DOL") issued regulations providing further guidance about the types of dress-related activities

that are compensable under the FLSA. One such regulation, 29 C.F.R. § 790.8(c), describes

"principal activity" as follows:

> Among the activities included as an integral part of a principal activity are those
> closely related activities which are indispensable to its performance. If an employee
> in a chemical plant, for example, cannot perform his principal activities without
> putting on certain clothes, changing clothes on the employer's premises at the
> beginning and end of the workday would be an integral part of the employee's
> principal activity. On the other hand, if changing clothes is merely a convenience
> to the employee and not directly related to his principal activities, it would be
> considered as a 'preliminary' or 'postliminary' activity rather than a principal part
> of the activity.

67.     More recently, in an advisory memorandum regarding the Supreme Court's

decision in *IBP v. Alvarez*, 546 U.S. 21 (2005), the DOL reiterated its view that the FLSA required

compensation for donning and doffing safety gear when the donning and doffing activities must

be performed at work. The DOL opined:

> Therefore, the time, no matter how minimal, that an employee is required to spend
> putting on and taking off gear on the employer's premises is compensable 'work'
> under the FLSA. … However, donning and doffing of required gear is within the
> continuous workday only when the employer or the nature of the job mandates that
> it take place on the employer's premises. It is our longstanding position that if
> employees have the option and the ability to change into the required gear at home,
> changing into that gear is not a principal activity, even when it takes place at the
> [worksite].

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at

*https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2*.

68.     In light of the Supreme Court's opinion in *Steiner*, numerous Circuit Courts have

endorsed the compensability of donning and doffing safety gear. For example, in *Tum v. Barber Foods, Inc.*, 360 F.3d 274, 278 (1st Cir. 2004), the First Circuit noted with approval the district court's opinion regarding the compensability of donning and doffing safety gear when wearing such gear is required by the employer and/or government regulation:

> The district court found that the donning and doffing of required gear is an integral and indispensable part of Employees' principal activities. *See generally Steiner v. Mitchell,* 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that activities should be considered integral and indispensable when they are part of the principal activities for the particular job tasks); *Mitchell v. King Packing Co.,* 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956). We agree with the district court's conclusion as to the required gear. In the context of this case, Employees are required by Barber Foods and or government regulation to wear the gear. Therefore, these tasks are integral to the principal activity and therefore compensable. *See Alvarez v. IBP, Inc.,* 339 F.3d 894, 903 (9th Cir. 2003) (holding that donning and doffing which is both required by law and done for the benefit of employer is integral and indispensable part of the workday); *cf.* 29 C.F.R. § 1910.132(a).

*Id*.

69.     In *Franklin v. Kellogg Co.,* 619 F.3d 604 (6th Cir. 2010), the Sixth Circuit considered the issue of employee compensation for time spent donning and doffing food protective clothing and safety gear at the beginning and the end of work shifts. The protective gear at issue included hair and beard nets, safety glasses, ear plugs, and "bump caps." *Id.* at 608. The Sixth Circuit applied the *Steiner* test, asking whether the activities of donning and doffing were an "integral and indispensable" part of the principal activity of the employment. *Id.* at 619-20. The Sixth Circuit answered this question in the affirmative, reasoning that the activities were required by the manufacturer, and ensured untainted products and safe and sanitary working conditions. *Id.* at 620.

70.     In a case involving the donning and doffing of protective gear at a meat processing plant, *Alvarez v. IBP, Inc.,* 339 F.3d 894 (9th Cir. 2003), *aff'd,* 546 U.S. 21 (2005), the Ninth Circuit also applied the *Steiner* test. The court considered whether these activities of donning and

doffing at the beginning and end of a work shift were "integral and indispensable" to the principal

activity of the employment, inquiring whether the activities were "necessary to the principal work

performed and done for the benefit of the employer." *Id.* at 902-03. The Ninth Circuit concluded

that the "integral and indispensable" test set forth in *Steiner* was satisfied with regard to the

donning and doffing of all the protective gear at issue. *Id.* at 903.

**H.**     **Plaintiffs' Walking Time is Compensable Because it Occurred After the Beginning of their First Principal Activity and Before the End of their Last Principal Activity**

71.     The time spent by Plaintiffs walking to and from the locker room and production

area was compensable because it occurred after donning their PPE and before doffing their PPE.

72.     On appeal to the Supreme Court, the employers in *Alvarez* did not challenge the

Ninth Circuit's holding that, in light of *Steiner,* donning and doffing of protective equipment is

compensable under the Portal Act. *Alvarez,* 546 U.S. at 32. Instead, the employers appealed a

separate ruling regarding the compensability of walking time. *Id.* The Supreme Court held that

walking time is compensable if it occurs after the beginning of the employee's first principal

activity and before the end of the employee's last principal activity. *Id.* at 37.

73.     In the wake of the Supreme Court's decision in *Alvarez*, the DOL issued an advisory

memorandum stating, in pertinent part,

> The Supreme Court's unanimous decision in *Alvarez* holds that employees who
> work in meat and poultry processing plants must be paid for the time they spend
> walking between the place where they put on and take off protective equipment and
> the place where they process the meat or poultry. The Court determined that
> donning and doffing gear is a "principal activity" under the Portal to Portal Act, 29
> U.S.C. 254, and thus time spent in those activities, as well as any walking and
> waiting time that occurs after the employee engages in his first principal activity
> and before he finishes his last principal activity, is part of a "continuous workday"
> and is compensable under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et
> seq.

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at

*https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2* (footnote omitted).

### I.    Defendant's Regular Rate Violations

74.    Defendant paid Plaintiffs an hourly wage, plus incentive compensation in the form of non-discretionary bonuses. *See e.g.*, **Exhibit B**, Plaintiff's November 24, 2021 Earnings Statement.

75.    Under the FLSA, the "regular rate" at which an employee must be paid includes "***all remuneration*** for employment paid to, or on behalf of, the employee," divided by hours worked in a workweek. 29 U.S.C. § 207(e) (emphasis added).

76.    Defendant violated the FLSA's overtime provisions, 29 U.S.C. § 207, by systematically failing to include all remuneration in Plaintiffs' regular rates of pay when computing overtime pay, specifically, nondiscretionary incentive compensation.

77.    Consequently, Plaintiffs were paid at artificially low overtime rates.

### J.    Defendant Breached Their Contractual Obligation to Pay Plaintiffs their Regular Hourly Rates for Each Hour Worked

78.    In approximately October 2021, Defendant offered Plaintiff the opportunity to work for Defendant as an hourly production employee.

79.    In consideration for Plaintiff's work as an hourly production employee, Defendant promised to pay Plaintiff an hourly wage for each hour she worked for Defendant.

80.    In approximately October 2021, Plaintiff accepted Defendant's offer of employment and began working for Defendant, creating a valid agreement between Defendant and Plaintiff whereby Defendant was obligated to pay Plaintiff her agreed hourly rate of pay for each hour that she worked for Defendant, including the compensable donning, doffing, and walking activities described herein.

81.    Throughout her employment with Defendant as an hourly production employee, Plaintiff performed all of the work required by Defendant, including the donning, doffing, and

16

walking activities described herein. In performing this work, Plaintiff fulfilled all of her duties under the agreement.

82.    However, throughout Plaintiff's entire employment with Defendant, Defendant repeatedly and systematically breached the agreement by not paying Plaintiff her regular hourly rate of pay for the donning, doffing, and walking activities described herein.

83.    Defendant's failure to pay Plaintiff for each hour of work she performed and that was required of her as an hourly production employee was a material breach by Defendant.

84.    Because of Defendant's breaches, Plaintiff was deprived of wages owed to her under the agreement, including unpaid "gap time" wages.[2]

85.    Upon information and belief, all of the other hourly production employees who worked for Defendant had a similar valid agreement with Defendant.

86.    Upon information and belief, Defendant repeatedly and systematically breached its agreements with all the other hourly production employees it employed in the same way it breached its agreement with Plaintiff.

87.    Defendant's promises to pay Plaintiffs' applicable hourly rate for each hour worked is evidenced by, among other things, each earnings statement issued to Plaintiffs.

88.    Plaintiffs are owed wages at their agreed hourly wage rates for the time that they worked off the clock during their employment with Defendant, including unpaid "gap time" wages.

89.    Plaintiffs earned these wages at the moment they performed the off-the-clock work;

_____

[2] "Gap time" refers to time that is not covered by the FLSA's overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the FLSA's minimum wage provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their pay is averaged across their actual time worked.  This "gap time" does not refer to "overtime gap time" which encompasses unpaid time up to 40 hours in those work weeks where the employee should also have also received overtime for hours in excess of 40.  This "overtime gap time" is covered by the FLSA's overtime provisions.

and the wages were due to be paid to Plaintiffs no later than the pay day for the period in which the off-the-clock work was performed.

90.     Despite the fact that Plaintiffs performed the off-the-clock work before and after their scheduled shifts, these off-the-clock hours were not peripheral or collateral tasks for which they were owed additional compensation. Instead, the off-the-clock work, which was performed by Plaintiffs pursuant to Defendant's express instructions, constituted principal work activities that were integral and indispensable to Plaintiffs' work; and Defendant was obligated to pay Plaintiffs for this time at the regular hourly rates at which they were employed.

91.     The fact that Defendant deliberately chose not to compensate Plaintiffs for this work, and that the off-the-clock work was performed before and after Plaintiffs' scheduled shifts, does not somehow relieve Defendant of its obligations to pay Plaintiffs for this time.

92.     Defendant was obligated to pay Plaintiffs their regular rates of pay for *all hours worked*, including hours worked before after their scheduled work shifts.

**K.**     **Defendant Benefitted from the Unpaid Donning, Doffing, and Walking Activities**

93.     At all relevant times, Defendant directed and directly benefited from the work performed by Plaintiff and similarly situated employees in connection with the above-described pre-shift, mid-shift, and post-shift donning, doffing, and walking activities performed by Plaintiffs.

94.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiffs.

95.     At all relevant times, Defendant was able to track the amount of time Plaintiffs spent in connection with the pre-shift, mid-shift, and post-shift donning, doffing, and walking activities. However, Defendant failed to do so and failed to pay Plaintiffs for all of the work they performed.

96.     At all relevant times, Plaintiffs were non-exempt employees, subject to the

requirements of the FLSA and state wage and hour law.

97.     At all relevant times, Defendant used its attendance and adherence policies against Plaintiffs in order to pressure them into performing the pre-shift, mid-shift, and post-shift donning, doffing, and walking activities without pay.

98.     Defendant expressly trained and instructed Plaintiffs to begin performing the above-described pre-shift donning and walking activities *before* the start of their scheduled shifts to ensure they were prepared to engage in their production activities before "clocking-in" to Defendant's timekeeping system.

99.     At all relevant times, Defendant's policies and practices deprived Plaintiffs of wages owed for the pre-shift, mid-shift, and post-shift donning, doffing, and walking activities they performed. Because Plaintiffs regularly worked 40 hours or more per week, Defendant's policies and practices also deprived them of overtime pay.

100.    Defendant knew or should have known that the time spent by Plaintiffs in connection with the pre-shift, mid-shift, and post-shift donning, doffing, and walking activities was compensable under the law. Indeed, in light of the explicit DOL guidance and Supreme Court case law cited above, there is no conceivable way for Defendant to establish that they acted in good faith.

101.    Despite knowing Plaintiffs performed work before and after their scheduled work shifts, Defendant failed to make any effort to stop or disallow the pre-, mid-, and post-shift work and instead suffered and permitted it to happen.

102.    Unpaid wages related to the pre-shift, mid-shift, and post-shift work described herein are owed to Plaintiffs at the FLSA mandated overtime premium of one and one-half times the regular hourly rates at which they were employed because Plaintiffs regularly worked 40 hours

or more per week.

## FLSA COLLECTIVE ACTION ALLEGATIONS

103.     Plaintiff brings this action pursuant to 29 U.S.C. § 216(b) of the FLSA on her own behalf and on behalf of:

> *All current and former hourly production employees who worked for Gardner Pie Company during the last three years*.

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition if necessary.

104.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and other similarly situated production employees.

105.     Excluded from the proposed FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

106.     Consistent with Defendant's policy and pattern or practice, Plaintiff and the FLSA Collective were not paid premium overtime compensation for all hours worked when they worked over 40 hours or close to 40 hours in a workweek.

107.     Defendant assigned and/or was aware of all of the work that Plaintiff and the FLSA Collective performed.

108.     As part of their regular business practices, Defendant intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

> a.     Willfully failing to pay their employees, including Plaintiff and the FLSA Collective, premium overtime wages for all hours worked in excess of 40 hours per workweek;

      b.      Willfully failing to record all of the time that their employees, including Plaintiff and the FLSA Collective, worked for the benefit of Defendant; and

      c.      Willfully failing to include incentive bonuses into the required regular rate calculation.

109.    Defendant is aware or should have been aware that federal law required it to pay Plaintiff and the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek.

110.    Defendant's unlawful conduct has been widespread, repeated, and consistent.

111.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

112.    The employment relationships between Defendant and every proposed FLSA Collective member are the same. The key issues - the amount of uncompensated donning, doffing, and walking time - do not vary substantially among the proposed FLSA Collective members.

113.    Many similarly situated current and former production employees were underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

114.    Court-supervised notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

115.    Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

116.    Plaintiff estimates the proposed FLSA Collective, including both current and

former employees over the relevant period, will include hundreds of workers. The precise number of FLSA Collective members should be readily ascertainable from a review of Defendant's personnel and payroll records.

## RULE 23 CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on her own behalf and on behalf of:

> *All current and former hourly production employees who worked for Gardner Pie Company during the applicable statute of limitations period.*

(hereinafter referred to as the "Rule 23 Class"). Plaintiff reserves the right to amend the putative class definition if necessary.

118.    The Rule 23 Class members are so numerous that joinder of all Rule 23 Class members in this case would be impractical. Plaintiff reasonably estimates there are hundreds of Rule 23 Class members. Rule 23 Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

119.    There is a well-defined community of interest among Rule 23 Class members and common questions of law and fact predominate in this action over any questions affecting individual Rule 23 Class members. These common legal and factual questions include, but are not limited to, the following:

    a.    Whether the time Rule 23 Class members spent on pre-shift and post-shift donning, doffing, and walking activities is compensable time under Ohio state law and pursuant to their employment contract; and

    b.    Whether Rule 23 Class members are owed wages for time spent performing pre-shift, mid-shift, and post-shift donning, doffing, and walking activities, and if so, the appropriate amount thereof under Ohio state law and their employment contract.

120.    Plaintiff's claims are typical of those of the Rule 23 Class in that she and all other Rule 23 Class members suffered damages as a direct and proximate result of Defendant's common

and systemic payroll policies and practices. Plaintiff's claims arise from the same policies, practices, promises, and course of conduct as all other Rule 23 Class members' claims, and her legal theories are based on the same legal theories as all other Rule 23 Class members.

121.    Plaintiff will fully and adequately protect the interests of the Rule 23 Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor her counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Class.

122.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout Ohio.

123.    This case will be manageable as a Rule 23 Class action. Plaintiff and her counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

124.    Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

125.    Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Class and declaratory relief is appropriate in this case with respect to the Rule 23 Class as

a whole, class certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.

**COUNT I**
**VIOLATION OF FLSA, 29 U.S.C. § 201 *et seq.***
**FAILURE TO PAY OVERTIME WAGES**
**(29 U.S.C. § 216(b) Collective Action)**

126.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

127.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

128.    At all times relevant to this action, Plaintiff and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

129.    Plaintiff and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

130.    Plaintiff and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

131.    At all times relevant to this action, Defendant "suffered or permitted" Plaintiff and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

132.    At all times relevant to this action, Defendant required Plaintiff and the FLSA Collective to perform unpaid off-the-clock work in connection with their donning, doffing, and walking activities, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

133.    The off-the-clock work performed every shift by Plaintiff and the FLSA Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

134.    In workweeks where Plaintiff and other FLSA Collective members worked over 40 hours, the unpaid off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of one and one-half times each employee's regular hourly wage, including shift differential pay, nondiscretionary incentive pay, and all other non-excludable remuneration. 29 U.S.C. § 207.

135.    Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have determined how long it took Plaintiffs to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly paid Plaintiff and the FLSA Collective for these work activities, but deliberately chose not to.

136.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT**
**OHIO REV. CODE ANN. § 4111 *et seq*.**
**(On Behalf of the Rule 23 Ohio Class)**

137.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

138.    At all times relevant to this action, Defendant was an employer covered by the overtime and wage mandates of the Ohio Minimum Fair Wage Standards Act (the "Ohio Wage Act"), and Plaintiff was an employee entitled to the Ohio Wage Act's protections. *See* Ohio Rev. Code Ann. § 4111.03.

139.    The Ohio Wage Act entitles employees to compensation for every hour worked in a workweek. *See* Ohio Rev. Code Ann. § 4111.01.

140.    The Ohio Wage Act entitles employees to overtime compensation at a rate equal to one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per week.

*See* Ohio Rev. Code Ann. § 4111.03.

141.    Defendant violated the Ohio Wage Act by regularly and repeatedly failing to pay Plaintiff for the time spent on the off-the-clock work activities described in this Complaint and by failing to include all remuneration when computing Plaintiff's regular rate of pay for purposes of overtime.

142.    As a result, Plaintiff has and will continue to suffer loss of income and other damages.

143.    Accordingly, Plaintiff is entitled to recover unpaid wages owed, plus costs and attorneys' fees, and other appropriate relief under the Ohio Wage Act at an amount to be proven at trial.

**COUNT III**
**VIOLATIONS OF THE OHIO PROMPT PAY ACT**
**OHIO REV. CODE ANN. § 4113.15**
**(On Behalf of the Rule 23 Ohio Class)**

144.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

145.    Ohio Rev. Code Ann. § 4113.15(A) required that employers pay their employees on or before the first day of each month wages earned during the first half of the preceding month ending with the 15th day thereof and pay their employees on or before the 15th day of each month wages earned during the second half of the preceding month.

146.    Ohio Rev. Code Ann. § 4113.15(B) required that where wages remain unpaid for 30 days beyond a regularly scheduled payday and no contest, court order, or dispute accounts for the non-payment, the employee is entitled to liquidated damages in the amount of 6% or $200.00 per violation, whichever is greater.

147.    No bona fide and legally cognizable dispute related to wages exists accounting for Defendant's failure to timely pay Plaintiff.

148.     Accordingly, Plaintiff is entitled to recover the amount of damages due and owing from Defendant under Ohio Rev. Code Ann. § 4113.15(B).

### COUNT IV
### BREACH OF CONTRACT
### (On Behalf of the Rule 23 Class)

149.     Plaintiff re-alleges and incorporates all previous paragraphs herein.

150.     At all times relevant to this action, Defendant had a binding and valid contract with Plaintiff and every other Rule 23 Class member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate in consideration of the work duties Plaintiff and the Rule 23 Class members performed on Defendant's behalf.

151.     Defendant's contractual promises to pay Plaintiff and each Rule 23 Class member's applicable hourly rate is evidenced by, among other things, each earnings statement issued to Plaintiff and the Rule 23 Class members.

152.     Plaintiff and every other Rule 23 Class member accepted the terms of Defendant's contractual promises and performed under the contract by doing their jobs and carrying out the work they performed each shift, including the unpaid off-the-clock work that was required of them, accepted by Defendant, and that they performed, in connection with the donning, doffing, and walking activities described herein.

153.     By not paying Plaintiff and every other Rule 23 Class member the agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, Defendant systematically breached its contracts with Plaintiff and each Rule 23 Class member.

154.     Plaintiff's and the Rule 23 Class members' remedies under the FLSA are inadequate in this case to the extent Defendant paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure "gap time" claims).

155.    As a direct and proximate result of Defendant's contractual breaches, Plaintiff and the Rule 23 Class members have been damaged in an amount to be determined at trial.

### COUNT V
### UNJUST ENRICHMENT
### (On Behalf of the Rule 23 Class)

156.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

157.    This Count is pled in the alternative to Count IV, *supra*, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

158.    At all times relevant to this action, Defendant promised Plaintiff and every other Rule 23 Class member a pre-established regular hourly rate in consideration of the work duties Plaintiff and the Rule 23 Class members performed for the benefit of Defendant.

159.    Plaintiff and every other Rule 23 Class member relied upon Defendant's promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

160.    By not paying Plaintiff and every other Rule 23 Class member the agreed upon hourly wage for the off-the-clock work they performed each shift, Defendant was unjustly enriched.

161.    Plaintiff and the Rule 23 Class members performed off-the-clock work tasks at the request of, without objection by, and for the benefit of, Defendant.

162.    Defendant received and accepted the above-referenced off-the-clock work services from Plaintiff and every other Rule 23 Class member and enjoyed the benefits derived therefrom, including increased profits, without having paid for the same.

163.    Upon information and belief, Defendant used the monies owed to Plaintiff and every other Rule 23 Class member to finance its various business ventures or pay its equity owners.

164.    Defendant has been unjustly enriched by the retention of monies received pursuant to the services Plaintiff and the Rule 23 Class performed for Defendant's benefit, without having

paid Plaintiff and the Rule 23 Class for the same.

165.    Plaintiff and the Rule 23 Class suffered detriment due to Defendant's failure to pay

them for the off-the-clock work described herein, in that Plaintiff and the Rule 23 Class were

deprived of the ability to utilize that time, effort and their resources in a profitable manner.

166.    As a direct and proximate result of Defendant's actions, Plaintiff and every other

Rule 23 Class member suffered damages, including but not limited to, loss of wages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the putative FLSA Collective

and Rule 23 Classes, requests judgment as follows:

a.    Certifying this case as a collective action under 29 U.S.C. § 216(b) with respect to Plaintiff's FLSA claim (Count I);

b.    Certifying this action as a class action (for the Rule 23 Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiff's Ohio state law claims (Counts II-III), as well as Plaintiff's breach of contract and unjust enrichment claims (Counts IV-V);

c.    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, email addresses, phone numbers and dates and location of employment of all FLSA Collective members, and permitting Plaintiff to send notice of this action to all those similarly situated individuals, apprising the FLSA Collective members of their rights by law to join and participate in this lawsuit;

d.    Designating Plaintiff as the representative of the FLSA Collective and the Rule 23 Class, and undersigned counsel as Class counsel for the same;

e.    Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

f.    Declaring Defendant's violations of the FLSA were willful;

g.    Declaring Defendant violated the Ohio Wage Act and the Ohio Prompt Pay Act;

h.    Declaring Defendant's violations of the Ohio Wage Act and the Ohio Prompt Pay Act were willful;

i.    Declaring Defendant breached their contracts with Plaintiff and the Rule 23 Class members (or, in the alternative, that Defendant was unjustly enriched) by failing to

pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

j.      Granting judgment in favor of Plaintiff and against Defendant and awarding Plaintiff and the FLSA Collective and the Rule 23 Class the full amount of damages and liquidated damages available by law;

k.      Awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

l.      Awarding pre- and post-judgment interest to Plaintiff on these damages; and

m.      Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, by and through her attorneys, hereby demands a trial by jury under Fed. R. Civ. P. 38.

Dated:  November 23, 2022          Respectfully Submitted,

*/s/ Matthew L. Turner*
Matthew L. Turner (pro hac vice anticipated)
Jesse L. Young (pro hac vice anticipated)
Albert J. Asciutto (pro hac vice anticipated)
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Tel: (248) 355-0300
mturner@sommerspc.com
jyoung@sommerspc.com
aasciutto@sommerspc.com

*Counsel for Plaintiffs and the*
*Proposed Collective and Class*